# Exhibit C

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| JEREMY FODOR,<br><br>    Claimant,<br><br> v.<br><br>POSTMATES INC.,<br><br>    Respondent. | AAA No. 01-19-0004-6399<br><br>**ANSWER TO ARBITRATION DEMAND** |

THEANE EVANGELIS, SBN 243570
 tevangelis@gibsondunn.com
BRADLEY HAMBURGER, SBN 266916
 bhamburger@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
 dmanthripragada@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

JAMES P. FOGELMAN, SBN 161584
 jfogelman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026

MICHELE L. MARYOTT, SBN 191993
 mmaryott@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412

Attorneys for Respondent POSTMATES INC.

Pursuant to Rule 5(a) of the AAA Commercial Arbitration Rules, Respondent Postmates Inc. hereby answers the Demand filed by Claimant Jeremy Fodor, as follows.[1] Postmates generally denies each and every material allegation contained in the Demand. Postmates further denies that Fodor was damaged in any amount by reason of any act or omission on the part of, or attributable to, Postmates.

I.  INTRODUCTION

Postmates is a technology company. Postmates operates an app-based platform that connects consumers with local merchants and (if consumers request delivery) independent couriers to facilitate the purchase, fulfillment, and, when applicable, local delivery of purchased products from merchants to consumers. Postmates does not hire couriers, but it allows them to use the Postmates App to find delivery opportunities. Consumers can submit delivery requests in the Postmates App tailored to their specific delivery needs. For example, a consumer can request delivery of anything from takeout to groceries from a diverse set of local merchants, including small businesses for whom the Postmates App provides an efficient and expansive tool to reach new customers. The consumer can connect with a merchant, and if they desire delivery, with an independent courier through the Postmates App to ensure local delivery of any item from any store or restaurant within minutes.

Couriers use the Postmates App to create an independent connection with a merchant and consumer based on the merchant's and consumer's local delivery needs. More than 300,000 independent contractor couriers in California currently use the Postmates App to find and provide services to merchants and consumers. The vast majority of couriers use the Postmates App to provide delivery services only intermittently and for short periods of time. Some independent couriers make frequent deliveries for weeks and then discontinue all deliveries for months, only to resume making deliveries again. Other independent couriers use the Postmates App to make deliveries for only a few

---

[1] Postmates submits this Answering Statement pursuant to its agreement to begin the arbitration of fifty claims while reserving all rights to object to the nature of this and other claims filed by Claimant's counsel. By submitting this Answering Statement, Postmates does not waive its right to argue that Claimant's counsel is pursuing de facto class arbitration, which is prohibited by the Fleet Agreement. *See* Postmates' Motion to Compel Arbitration at 5, *Adams v. Postmates*, No. 3:19-cv-03042 (N.D. Cal. June 27, 2019). Postmates also reserves its right to argue that arbitration of Claimant's claim should be stayed pending the Ninth Circuit's decision on its appeal in *Adams v. Postmates*, No. 19-17362 (9th Cir. Ct. App.), and/or final approval of the settlement reached in *Rimler v. Postmates*, No. CGC-18-567868 (S.F. Super. Ct).

short weeks to satisfy a temporary need for income and then never use the Postmates App to facilitate deliveries again (at least as far as Postmates knows, because these couriers retain access to the Postmates App and could use it again if they choose to do so). Postmates' current business model can accommodate all of these types of independent couriers, dynamically matching supply and demand in real time.

Yet, Fodor alleges that he made deliveries using the Postmates App as a courier, and that Postmates misclassified him as an independent contractor rather than an employee. He seeks unspecified relief under a variety of federal, state, and local laws. But when Fodor signed up to use the Postmates App as a courier, he expressly agreed that he was "an independent contractor engaged in the business of performing the type of delivery services contemplated by" the parties' Fleet Agreement, not an employee of Postmates. 2018 Fleet Agreement at 1. And Fodor *acted* as an independent contractor.

The Fleet Agreement, which governs the relationship between Postmates and couriers, allows Fodor to work as much or as little as he wants. There is no set schedule, minimum-hours requirement, or minimum-delivery requirement. Under the Fleet Agreement, Fodor is "free to select the times [he] wish[es] to use" the Postmates App. 2018 Fleet Agreement at 2. Even when he is logged in to the App, Fodor is "free to accept, reject, or ignore any particular [d]elivery [o]pportunities made available to [him] through" the App. *Id.* He is also free to use other lead-generation apps at the same time as he uses the Postmates app, and to accept whatever delivery or other opportunity he prefers to take. Postmates does not have a policy preventing Fodor from working full-time or part-time for himself or third parties. And Postmates does not have a policy preventing Fodor from "multi-apping"—i.e., using other apps like Grubhub or DoorDash at the same time as the Postmates App to take on multiple forms of on-demand work. As a result, Fodor can transition from using the Postmates App to other apps simply by swiping his phone. A barista cannot leave his coffee shop mid-shift when there are no customers, travel across the street to do barista work for a rival coffee shop, and then come back to his original coffee shop to continue barista work. But Fodor has the freedom and flexibility to use multiple competitor apps simultaneously to maximize his income. That's the level of autonomy that Postmates provides to Fodor to start and stop his business and work across apps. Postmates is a means for

independent couriers like Fodor to become their own bosses and operate their own delivery businesses with unprecedented autonomy.

Fodor is also free to determine *how* he performs deliveries, as the Fleet Agreement grants couriers "the sole right to control the manner in which [d]eliveries are performed and the means by which those deliveries are completed." *Id.* Postmates operates no vehicle to assist Fodor with his deliveries, does not require the use of specific tools or equipment, does not oversee the appearance of Fodor or his vehicle, and does not require any specific route.

Thus, Fodor, like all couriers, enjoys an extraordinary level of freedom and flexibility as a courier. Fodor can use the Postmates App when he wants, where he wants, and how he wants. He can use a variety of strategies to maximize his revenue while using the Postmates App, can use subcontractors to "assist [him] with some or all" of the work associated with making deliveries, and he can "perform[] delivery services for other entities or customers," including by using other apps that "directly compete with Postmates." 2018 Fleet Agreement §§ 2B, 2C; 2019 Fleet Agreement § 2D. Because Fodor, rather than Postmates, controls whether, when, and how he works, and Fodor independently operates his own delivery business while using the app provided by a technology company, Fodor is an independent contractor, not an employee, and he is not entitled to any relief.

Not only do Fodor's claims lack merit, but his demand is deficient as well. By signing the Fleet Agreement, Fodor agreed to resolve disputes with Postmates in binding bilateral arbitration, and to initiate arbitration in a particular way: by submitting an arbitration demand that states the legal and factual basis of his claim and describes the remedy he seeks. 2018 Fleet Agreement § 11B.i. AAA's rules, which are incorporated into the Fleet Agreement, similarly require him to identify "the nature of the claim including the relief sought and the amount involved." AAA Commercial Arb. Rules, R-4(e)(iv). He has failed on both fronts. His demand provides only a conclusory assertion of the basis of his claim, and it does not describe the remedy he seeks whatsoever. Fodor's demand is deficient under the terms of the Fleet Agreement and AAA's rules, and he should be required to provide Postmates with a more definite statement of his claims and remedies before arbitration proceeds any further. If Fodor cannot provide a more definite statement, then his claims should be dismissed.

II. **BACKGROUND**

**A.     Postmates Is a Technology Company.**

Postmates operates an app-based platform that connects (i) consumers wishing to purchase goods (such as food) (ii) with merchants and (iii) if consumers request delivery, with independent couriers willing to locally deliver the purchased goods.  The service that Postmates provides is access to its app, which facilitates the purchase, fulfillment, and, when applicable, local delivery of purchased products from merchants to consumers.  It does not hire delivery persons; it is a technology company that creates and operates an app.  For consumers with local delivery needs, the app facilitates the connection of consumers and independent service providers, so that consumers can hire independent service providers to perform particular services.  Postmates has about only 1,200 actual employees.  These employees are dedicated to sales, engineering, analytics, strategy, design, support (of merchants, couriers, and other aspects of the platform), and other functions.  Postmates has various lines of business and revenue streams.  Delivery by independent couriers is only one source of Postmates' revenue.

**B.     The Fleet Agreement Allows Couriers to Choose When, Where, and How They Work.**

Anyone can sign up to be a courier, but all new couriers must accept Postmates' Fleet Agreement before accessing the App and receiving delivery opportunities.  The Fleet Agreement governs the relationship between Postmates and couriers, and expressly provides that couriers are "independent contractor[s]." 2018 Fleet Agreement at 1.

When a customer requests delivery of an item, the Postmates App notifies nearby couriers of the delivery opportunity.  A courier is not required to accept any particular delivery opportunity, and in fact couriers are "free to . . . reject[] or ignore" any and every delivery opportunity made available to them, at any time and for any reason.  Couriers also are "free to select those times [they] wish[] to use the Postmates Platform." *Id.*  There is no penalty for ignoring or rejecting a delivery opportunity, and couriers can go days, weeks, or months without making deliveries using the Postmates App.

The Fleet Agreement also expressly provides that Postmates does not "supervise, direct or control" couriers "or control the manner or prescribe the method" couriers use to make deliveries; to the contrary, couriers are "*solely* responsible for determining the most effective, efficient, satisfactory,

and safe manner to perform [d]eliveries, including determining the manner of pickup, delivery, and route selection." 2018 Fleet Agreement § 2B (emphasis added).

Because Postmates does not control the manner in which couriers make deliveries, there are many ways for couriers to maximize their earnings while using the Postmates App. For instance, couriers can decide *how* to make deliveries—*i.e.*, by bicycle, by motorcycle, or by car, a decision that may affect delivery time and the total number of deliveries made. Couriers also can choose *whether* to accept multiple delivery opportunities at once, which may affect total earnings, delivery times, and customer satisfaction. And couriers can choose *where* to accept deliveries, concentrating on high-density areas, high-demand areas, or neither. They also can decide *when* they want to work—for instance, they can choose to work during high-demand times when delivery opportunities are most frequent.

Couriers also have several options for improving customer satisfaction—and thus the tips they earn. For instance, they can choose to ensure that orders are complete before making deliveries, communicate with customers throughout the delivery process, deliver orders by hand (as opposed to leaving them on a doorstep), give customers receipts, and ask customers to rate their experience in the App.

### C. The Fleet Agreement Allows Couriers to Operate Independent Delivery Businesses.

Because Postmates is a technology company rather than a delivery company, couriers who use the Postmates App to find delivery opportunities are performing work that is outside Postmates' usual course of business. The Fleet Agreement recognizes this, and it expressly gives couriers the freedom to establish independent delivery businesses and to find work using platforms other than the Postmates App.

Couriers are free to use the Postmates App simultaneously with other apps that provide delivery leads—including those operated by Postmates' direct competitors. 2018 Fleet Agreement § 2C ("Postmates neither has nor reserves the right to restrict Contractor at any time from performing delivery services for other entities or customers, even should such business directly compete with Postmates."). Thus, a courier could simultaneously identify delivery opportunities using apps including Postmates, DoorDash, Grubhub, and Uber Eats, and choose to complete the deliveries that

would be most lucrative. A courier could also use the Postmates App while using platforms that facilitate the provision of other services. For example, a driver who uses the Lyft App could use the Postmates App to identify delivery opportunities and make additional money between Lyft rides.

Because couriers are free to use Postmates simultaneously with other apps, couriers can and do operate independent delivery businesses whereby they use multiple apps to identify delivery opportunities and make deliveries of a variety of products to a variety of customers. They are free to advertise their independent businesses to both merchants and potential delivery recipients. And the Fleet Agreement allows couriers to "hir[e], subcontract[], or otherwise engag[e] any other person . . . to assist" them with the operation of their delivery businesses. 2019 Fleet Agreement § 2D. When couriers take advantage of the option to hire help, they "bear sole responsibility for the direction and control" of subcontractors, as well as payment of wages. *Id.*

**D.     The Parties Agree to Resolve Disputes In Individual Arbitration.**

The Fleet Agreement contains a conspicuous Mutual Arbitration Provision. 2018 Fleet Agreement § 11. Couriers are free to opt out of the mutual arbitration provision. *Id.* § 11B.ix. But those who choose not to opt out agree to resolve all disputes with Postmates in binding bilateral arbitration. *Id.* § 11A. The Fleet Agreement provides that if a party wishes to initiate arbitration, it must provide the other party with a written demand for arbitration. *Id.* § 11B.i. The "demand for arbitration *must include* (1) the name and address of the party seeking arbitration, (2) a statement of the legal and factual basis of the claim, and (3) a description of the remedy sought." *Id.* (emphasis added).

The Fleet Agreement also incorporates the AAA's rules governing arbitrations. 2018 Fleet Agreement § 11B.vi. The AAA's Commercial Arbitration Rules require that any filing intended to initiate arbitration include "a statement setting forth the nature of the claim including the relief sought *and the amount involved*." AAA Comm. Arb. Rule 4(e)(iv) (emphasis added).

**E.     Keller Lenkner Files Generic, Mass Arbitration Demands Against Postmates.**

In March 2019, Claimant's counsel at Keller Lenkner wrote to Postmates stating that it represented more than 3,000 couriers, and threatened to "proceed with every arbitration simultaneously" unless Postmates would "agree on an alternative process for resolving [its] clients'

claims." Keller Lenkner warned Postmates that it could be faced with more than $20 million in filing and arbitration fees if it carried out its threat. Postmates refused to cave to Keller Lenkner's demand, so on April 22, 2019, Keller Lenkner submitted a purported arbitration demand on behalf of 4,925 claimants. Rather than serve individual arbitration demands, Keller Lenkner provided AAA with one cover letter, one generalized "demand[] for arbitration," and a spreadsheet containing a list of 4,925 couriers whom it purported to represent. Keller Lenkner asserted that its single "demand for arbitration" somehow applied to all 4,925 couriers. Less than a month later, Keller Lenkner filed another mass arbitration demand on behalf of 768 claimants.

Keller Lenkner's omnibus arbitration demand did not include a statement of the legal and factual basis of each courier's individual claims. Instead, it made general statements about "claimants"; asserted that Postmates had violated federal, state, and local laws; and listed twenty different municipal codes that purportedly provided a basis for the claims. April 22 Arbitration Demand at 9-10. The demand also failed to identify the remedy and damages each claimant sought; instead, it baldly asserted that all claimants sought "appropriate equitable relief," an unspecified "award of damages, statutory penalties, and restitution," an "award of general damages," and attorneys' fees and costs. *Id.* at 11.

In June 2019, after Postmates notified AAA that Keller Lenkner's single, generic arbitration demand violated the Fleet Agreement, Keller Lenkner responded by serving more than 5,000 copied-and-pasted arbitration demands. These demands still did not identify any facts or legal theories specific to any particular claimant. Nor did they identify the type of remedy any individual claimant sought or the amount in controversy.

Keller Lenkner later sued Postmates in the Northern District of California. On October 22, 2019, after those proceedings concluded, Keller Lenkner re-filed 5,255 cookie-cutter, generic arbitration demands with AAA. Although Keller Lenkner submitted 5,255 separate documents, each demand contains the exact same allegations as all the others. And each demand is still hopelessly deficient. For example, the Fleet Agreement requires that an arbitration demand provide "a description of the remedy sought," 2018 Fleet Agreement § 11B.i, and AAA's rules require that an arbitration demand "set[] forth . . . the relief sought and the amount involved," Rule 5(e)(iv). Yet, Fodor's demand explicitly "decline[s] to specify the amount in controversy." Demand at 1. Fodor asserts that

information regarding the amount in controversy is "exclusively within the control of Postmates," but that is false. For example, the number of hours Fodor has worked, how much he has been paid, and where he worked are facts that are within Fodor's knowledge. Further, the App provides couriers with information regarding past deliveries and payments.

The demand also fails to specify the factual basis for Fodor's claim; instead, it makes the entirely conclusory assertion that "Postmates has misclassified Claimant as an independent contractor instead of an employee." *Id.* at 2. The demand does not explain why Fodor believes he should be considered an employee, when Fodor used the Postmates App, or what he considers compensable time. Nor does the demand specify any of the legal bases for Fodor's claim. Although it lists specific federal and California statutes, it simply asserts violation of "Applicable Municipal Codes," without specifying which municipality's codes apply to Fodor. Information about which municipalities' codes apply to his claim is certainly within Fodor's control, as is information about the facts that he alleges give rise to his claims. These deficiencies are not mere technical violations of the applicable rules. They have prevented Postmates from fully assessing the merits of Fodor's claims, and from being able to evaluate whether to make Fodor an individual settlement offer.

**F.     Postmates Reaches a Classwide Settlement of Misclassification Claims.**

In July 2019, Postmates reached a classwide settlement with representatives of a putative class of California couriers who had filed misclassification claims against Postmates in federal and state court. On October 8, 2019, Plaintiffs in *Rimler v. Postmates*, No. CGC-18-567868 (S.F. Super. Ct.) filed a motion for preliminary approval of the settlement, which would release all misclassification claims against Postmates pursuant to the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, California law, and local law. *See* Exhibit A to the Declaration of Shannon Liss-Riordan, Class Action Settlement Agreement & Release § 2.41, No. CGC-18-567868 (S.F. Super. Ct., Jan. 21, 2020). The settlement class period runs from June 3, 2017 through October 17, 2019. *Id.* § 2.43. The Superior Court requested more information about the proposed settlement agreement, which the plaintiffs provided on January 21, 2020. Plaintiffs' Supplemental Briefing In Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, No. CGC-18-567868 (S.F. Super. Ct., Jan. 21, 2020). If the settlement is approved and Fodor does not opt out, he will be a member of the settlement class

and his misclassification claims for deliveries made between June 3, 2017 and October 17, 2019 will be released.

### G. Fodor's Use of the Postmates App

Jeremy Fodor accepted the 2018 Fleet Agreement on December 29, 2018 and completed his first delivery using the Postmates platform on December 30, 2018. Since then, Fodor has completed a total of 64 deliveries using the Postmates App.

Fodor worked a variable schedule. Some days he completed multiple deliveries, and other days he made no deliveries at all. For example, he completed 4 deliveries on January 26, 2019, then did not use the Postmates App again until March 17, 2019. After that, Fodor did not use the platform for more than a month, then made 2 deliveries on April 28, 2019. He made deliveries sporadically until August 2019 and then stopped using the platform entirely until making a single delivery in December 2019.

In other words, Fodor was not required to work, and did not work, a regular schedule. He decided when he wanted to make deliveries and when he did not, and Postmates could not count on him to work at any particular time, or at all.

### III. GENERAL DENIAL

Postmates generally denies all allegations and claims asserted by Fodor. All allegations not specifically admitted herein are denied.

### IV. SEPARATE AND ADDITIONAL DEFENSES

By alleging the Separate and Additional Defenses set forth below, Postmates intends no alteration of the burden of proof and/or burden of going forward with evidence which otherwise exists with respect to any particular issue at law or equity. Further, all such defenses are pleaded in the alternative, and do not constitute an admission of liability or that Fodor ("Claimant") is entitled to any relief whatsoever. Finally, all defenses pleaded below are based on Postmates' limited understanding of the claims being asserted by Claimant in view of the conclusory Demand and are intended, among other things, to preserve all potential defenses upon further clarification of Claimant's assertions.

Postmates generally denies all allegations and claims asserted by Claimant. All allegations not specifically admitted herein are denied.

### **FIRST DEFENSE**

Claimant's claims fail to state a claim upon which relief can be granted.

**SECOND DEFENSE**

Claimant's claims are barred to the extent Claimant is seeking relief for conduct occurring outside the applicable statute of limitations, including, but not limited to, California Code of Civil Procedure section 340, and any other applicable statutes of limitations.

**THIRD DEFENSE**

Claimant's claims are barred in whole or in part to the extent that Claimant lacks standing to assert these matters against Respondent.

**FOURTH DEFENSE**

Claimant failed to properly exhaust all of his internal, contractual, administrative and/or statutorily required remedies, and such failure bars this arbitration proceeding in whole or in part and/or limits Claimant's claims.

**FIFTH DEFENSE**

Claimant's claims are barred for failure to comply with the parties' arbitration agreement and the AAA rules for initiating arbitration.

**SIXTH DEFENSE**

Claimant's claims are barred because they were not brought on an individual basis as required by the Fleet Agreement.

**SEVENTH DEFENSE**

At all material times, Respondent acted in a good faith belief that it was in compliance with all applicable statutes, laws, and regulations concerning payment of wages and any other compensation owed to Claimant. Respondent did not willfully violate the FLSA, California law, or any other law. Respondent acted in good faith reliance upon a reasonable interpretation of applicable law.

**EIGHTH DEFENSE**

Respondent acted reasonably and in good faith, without malice, at all material times, based on relevant facts and circumstances known at the time.

**NINTH DEFENSE**

Respondent exercised reasonable care to prevent and correct any alleged unlawful conduct.

**TENTH DEFENSE**

Claimant is barred from relief, in whole or in part, to the extent it results in an unjust enrichment to Claimant and/or any person on whose behalf relief is sought.

**ELEVENTH DEFENSE**

The doctrine of after-acquired evidence, and in particular Claimant's own improper conduct, bars or reduces Claimant's claims.

**TWELFTH DEFENSE**

Claimant's claims are barred in accordance with the equitable doctrines of waiver, estoppel, laches and unclean hands.

**THIRTEENTH DEFENSE**

Any recovery by Claimant, if any, is barred by his fraud, breaches of duty, breaches of contract and/or misconduct.

**FOURTEENTH DEFENSE**

Claimant's claims are barred because Claimant is exempt from the minimum wage and overtime pay provisions of the FLSA and California wage and hour laws because Claimant is an independent contractor, not an employee, and Respondent was not and/or is not the employer of Claimant and/or the allegedly aggrieved individuals.

**FIFTEENTH DEFENSE**

The Demand, and the purported cause of action contained therein, are barred in whole or in part, on the grounds that Respondent complied or substantially complied with all applicable laws underlying the Demand.

**SIXTEENTH DEFENSE**

The Demand, and the purported cause of action contained therein, are barred in whole or in part, to the extent the de minimis doctrine applies to Claimant's and/or the allegedly aggrieved individuals' claims.

**SEVENTEENTH DEFENSE**

The Demand, and the purported cause of action contained therein, are barred in whole or in part, on the grounds that Respondent had no knowledge of, nor should it have had knowledge of, any

alleged uncompensated work by Claimant and/or the allegedly aggrieved individuals and did not authorize, request, suffer, or permit any such activity by Claimant and/or the allegedly aggrieved individuals.

### EIGHTEENTH DEFENSE

The Demand, and the purported cause of action contained therein, are barred in whole or in part, on the grounds that Respondent and the allegedly aggrieved individuals were paid in full and therefore Respondent is released from any and all continuing obligations to them.

### NINETEENTH DEFENSE

Claimant's requested recovery is barred to the extent that Claimant has suffered no damages.

### TWENTIETH DEFENSE

A reasonable good faith dispute exists regarding the payment, if any, which was owed by Respondent to Claimant.

### TWENTY-FIRST DEFENSE

Some or all of the time for which Claimant seeks compensation is not compensable work time.

### TWENTY-SECOND DEFENSE

Claimant's claims may be barred in whole or in part by statutory exemptions, exclusions, exceptions, off-sets, or credits under the FLSA or applicable state law.

### TWENTY-THIRD DEFENSE

Respondent may be entitled to a credit or offset for any amounts overpaid to Claimant during the course of Claimant's use of the Postmates App and/or any sums heretofore received by Claimant from any source, including but not limited to unemployment insurance, state disability insurance, Social Security disability payments, workers' compensation payments, and any sums earned by Claimant in other employment.

### TWENTY-FOURTH DEFENSE

Claimant failed to mitigate Claimant's damages or reasonably try to mitigate damages if any.

### TWENTY-FIFTH DEFENSE

Claimant's claims are barred in whole or in part by Claimant's consent to and/or voluntary participation in all or some of the acts alleged or conduct similar thereto.

**TWENTY-SIXTH DEFENSE**

Claimant is barred from recovering any damages, or any recovery for lost wages must be offset or reduced pursuant to the avoidable consequences doctrine.

**TWENTY-SEVENTH DEFENSE**

If Claimant is entitled to any recovery, which Respondent specifically denies, any time spent performing any preliminary or postliminary activities must be excluded from any calculation of compensable work hours.

**TWENTY-EIGHTH DEFENSE**

If Claimant is entitled to any recovery, which Respondent specifically denies, the amount of such recovery may be offset by monies paid to them for hours they did not actually work and/or hours in which they were not entitled to payment.

**TWENTY-NINTH DEFENSE**

Claimant is not entitled to recover punitive or exemplary damages on the ground that any such award in general and/or as applied to the facts of this specific action violates Respondent's constitutional rights under provisions of the United States and California law.

**THIRTIETH DEFENSE**

Claimant's claims are barred to the extent they have been released.

**THIRTY-FIRST DEFENSE**

The penalties and fines sought are unconstitutional and excessive under the United States Constitution, and specifically under the Excessive Fines Clause of the Eighth Amendment of the United States Constitution and the Due Process Clause of Section 1 of the Fourteenth Amendment of the United States Constitution.

**THIRTY-SECOND DEFENSE**

The Demand, and the purported cause of action contained therein, are barred in whole or in part to the extent that the alleged injury, if any, resulted from the acts and/or omissions of Claimant and/or the allegedly aggrieved individuals.

**THIRTY-THIRD DEFENSE**

The harm alleged by Claimant, if any, was not proximately caused by any unlawful policy, custom, practice, and/or procedure promulgated and/or tolerated by Respondent. Nor are the harms alleged by Claimant, if any, caused in fact by Respondent. The cause of action asserted against Respondent is barred because the harm Claimant and/or any allegedly aggrieved individuals allegedly suffered, if any, was caused by superseding and intervening causes including factors, persons, or entities other than Respondent.

**THIRTY-FOURTH DEFENSE**

Claimant and/or the allegedly aggrieved individuals are barred from relief, in whole or in part, to the extent their claims are precluded under the doctrine of res judicata and/or collateral estoppel.

**THIRTY-FIFTH DEFENSE**

The Demand, and the purported cause of action contained therein, are barred in whole or in part because Respondent is not a hiring entity.

**THIRTY-SIXTH DEFENSE**

Any finding of liability under California's Assembly Bill 5 ("AB 5") would violate the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and of Article I, Section 3(b)(4) of the California Constitution, because AB 5 denies Respondent equal protection of the law.

**THIRTY-SEVENTH DEFENSE**

Any finding of liability under AB 5 would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Ninth Amendment to the United States Constitution, Article I, Sections 1 and 7 of the California Constitution, and the California Constitution's Baby Ninth Amendment, because AB 5 infringes the rights of Respondent and independent couriers to pursue their chosen profession, which is an essential component of liberty, property, happiness, and privacy.

**THIRTY-EIGHTH DEFENSE**

Any finding of liability under AB 5 would violate Article I, Section 10 of the United States Constitution, and of Article I, Section 9 of the California Constitution, because AB 5 would

substantially impair existing contracts between Respondent and couriers.

### THIRTY-NINTH DEFENSE

Any finding of liability based on the retroactive application of AB 5 would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution.

### FORTIETH DEFENSE

Any finding of liability based on the retroactive application of the California Supreme Court's decision in *Dynamex Operations W. v. Superior Court*, 416 P.3d 1 (Cal. 2018), would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution.

### RESERVATION OF RIGHTS

Respondent reserves the right to assert additional affirmative defenses, should such defenses become known to it during the course of these proceedings.

### V. REQUESTED RELIEF

**WHEREFORE**, Respondent demands judgment dismissing Claimant's Demand, and any and all claims asserted therein, in their entirety and with prejudice, awarding judgment in favor of Respondent, and granting Respondent such other and further relief as may be just and proper, including an award of costs, disbursements and attorneys' fees.

Dated: January 29, 2020

By: */s/ Theane Evangelis*
Theane Evangelis

Attorneys for Respondent POSTMATES INC.